

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).



ENTERED
CLERK, U.S. DISTRICT COURT

NOV 1 5 1999

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KURT JOHN VON COLLN, JR., KEITH GEORGE STRINGER, ERIC PRATT, JEFFERY LLOYD, <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> COUNTY OF VENTURA, SHERIFF LARRY CARPENTER in his official and personal capacity, SHERIFF ROB BROOKS in his official and personal capacity, CHIEF KEN KIPP in his official and personal capacity, deputies JOHN HAJDUCKO, DENNIS SMITH, CLINTON JOHNSON, EDWIN ILANO and TODD WERRE, AND Does 1-10 <br><br> Defendants. | CV-97-3896 LGB (CWx) Consolidated with <br><br> CV-97-8352 LGB (CWx) <br> CV-98-3051 LGB (CWx) <br> CV-98-6092 LGB (CWx) <br><br> ORDER (1) GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; (2) GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; (3) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND (4) DENYING DEFENDANTS' MOTION TO DISMISS. |

## I.   INTRODUCTION

Plaintiffs in this case were detained by the Ventura County Sheriff's Department ("VCSD") at different times.  During their detention, they were restrained in what has been called a "Pro-straint" chair.  A Pro-straint chair is comprised of a plastic chair, leg irons, handcuffs, and various straps.  Plaintiffs allege that the chair was used solely for the purpose of

1 | punishment, humiliation, and intimidation in violation of their
2 | constitutional rights.

3 | **II. FACTUAL AND PROCEDURAL HISTORY**

4 |     This case is brought by four individuals who were, at one
5 | point, detained by the VCSD, and on behalf of those similarly
6 | situated.  Plaintiff Von Colln alleges that on May 28, 1996, he
7 | accidentally fell off his bicycle.  See Consolidated Pls.' First
8 | Am. Compl. at 5.  As a result of the fall, he became unconscious.
9 | See id.  He was subsequently arrested and only regained
10 | consciousness upon arrival at the Ventura County Jail.  See id.
11 | Von Colln alleges that he was in custody for approximately 24
12 | hours, without ever being booked, or permitted to make a
13 | telephone call.  See id. at 6.  Furthermore, he alleges that when
14 | he asked what charges he was being detained for, he was stripped
15 | naked and sat down into a restraining chair.  See id. at 5.
16 | Restraints were placed around his wrists and ankles.  See id.
17 | Von Colln alleges that he was denied access to a bathroom, and as
18 | a result, while nude, defecated twice and urinated three times on
19 | himself.  See id.  After defecating and urinating on himself, he
20 | was not permitted to get up and clean up.  See id.  Von Colln
21 | alleges that he was so detained for approximately five and one
22 | half hours.  See id. at 6.  When Von Colln pleaded to be
23 | released, the shackles to his ankles were further tightened,
24 | causing a fracture of his ankle.  See id.  Furthermore, Von Colln
25 | alleges that while still restrained in the chair, he was wheeled
26 | into a bathroom and made to clean up his own feces and urine with
27 | his bare hands, and then permitted to shower.  See id.  As a
28 |

- 2 -

result of his broken ankle, Von Colln alleges that he could not
walk, yet he was given no medical treatment.  See id.  As a
result of these events, Von Colln alleges that he suffered severe
injuries.  See id.  He also alleges that he is now on probation
and lives in fear of being put back in the Pro-straint chair.
See id.

Plaintiff Stringer was arrested on November 25, 1996.  See
id. at 7.  He was taken into custody at his residence, and
transported to the Ventura County Jail.  See id.  He alleges that
he was non-violent at all times, and that he was never accused of
any acts of violence against the officers.  See id.  Upon
arriving at the county jail, he was first placed in a padded
"safety cell."  See id.  About one hour later, Stringer alleges
that he was taken into another cell.  See id.  Then, he claims
that his clothes were taken off and he was placed in the Pro-
straint chair, whereby restraints were placed on his wrists and
arms, and leg irons were placed around his ankles and clamped
down like handcuffs.  See id.  Stringer alleges that he was
restrained as such for approximately four hours and was denied
access to the bathroom or toilet facilities.  See id.  Stringer
alleges that the shackles were tight, thereby causing pain and
suffering.  See id.  When he complained of the pain, defendants
ignored him and ridiculed him.  See id.  Stringer alleges that
at no time did he show any signs of violence.  See id.
Furthermore, Stringer alleges that he was forced to urinate and
defecate on himself and forced to sit in his own feces and urine.
See id.  This treatment, he alleges, caused him severe pain in

his back and legs.  See id.  He also alleges that he is now on
probation and lives in fear of being put back in the Pro-straint
chair.  See id. at 7-8.

Plaintiff Pratt was stopped and questioned by the Oxnard
Police Department on July 27, 1997.  See id. at 8.  When he
questioned the validity of the stop, he was arrested.  See id.
When he questioned the validity of the arrest, he was handcuffed,
his feet were bound, and his handcuffed hands and bound feet were
tied together.  See id.  Pratt was later taken to the Ventura
County Jail.  See id.  He alleges that prior to his arrival at
the County Jail, the arresting officers told the deputy sheriff
that Pratt was "combative," although he alleges he was not.  See
id.  He states that he was never charged with either resisting
arrest or any crime of violence.  See id.  Pratt was then
immediately tied to the Pro-straint chair in the same manner as
described above.  See id.  However, a hood was also placed over
his head.  See id.  He remained restrained for over seven hours
during which the officers continuously refused to let him use the
bathroom.  See id.  He states that while he was in the chair, he
maintained a non-violent composure at all times, yet he was not
released from the chair.  See id.  Furthermore, he alleges that a
nurse asked on two occasions to have Pratt removed from the chair
for his safety, but the deputies refused.  See id.  When he was
released from the chair, he could not walk due to the pain and
numbness to his ankles, legs, and back.  See id. at 8-9.
Defendants ignored him and refused to provide medical care,
thereby causing him serious injuries.  See id.

- 4 -

1    Plaintiff Lloyd was also in custody at the Ventura County

2  Jail on August 19, 1997. See id. at 9.  Lloyd alleges that he

3  has a history of suffering from a mental disorder. See id.  In

4  the days before his arrest, Lloyd alleges that he went to the

5  Santa Paula mental health facility to obtain his medication.  See

6  id.  Unfortunately, however, he alleges that he was released with

7  the wrong medication, thereby making him more depressed. See id.

8  He alleges that the wrong medication made him suicidal.  See id.

9  As such, he allegedly attempted suicide by overdose of

10 medication.  See id.  When his family called for assistance, they

11 allegedly explained to the authorities that he was suicidal.  See

12 id.  When the police arrived Lloyd claims that he was "pepper

13 sprayed."  See id.  He was then taken to the county jail, where

14 he states that he too was placed in the Pro-straint chair.  See

15 id.  Similarly, restraints were placed around his wrists and

16 ankles.  See id.  Lloyd was refused access to the bathrooms, and

17 therefore could not defecate or urinate for many hours.  See id.

18 He alleged that he was deprived of all decency and privacy, and

19 endured inhumane pain, cramps and indignity while forced to

20 withhold voiding of urine and feces.  See id.  He claims that he

21 was never seen by a physician, even though the pepper spray

22 allegedly caused exacerbation of his depressed and suicidal

23 state.  See id.  Plaintiff Lloyd claims that when he was released

24 from the chair, he could not walk due to excruciating pain and

25 numbness to his ankles, legs, and back.  See id.  Furthermore,

26 plaintiff alleges that the defendants either lost or failed to

27 create a monitoring log or other record of who, if anyone, made

28

1   the decision to place Lloyd in the chair for his suicidal state.

2   See id. at 10.   On May 21, 1998, Lloyd was again in custody at

3   the county jail.  See id.  He alleges that at that time he

4   verbally protested that his transfer to a medical facility was

5   being delayed.  See id.  In response, the deputies allegedly

6   threatened to place him in the chair.  See id.

7        Plaintiff Lloyd is currently at the Metropolitan State

8   Mental Hospital in Norwalk, and is awaiting trial, pending a

9   determination of his mental ability to stand trial.  See  Defs.'

10  Reply Mem. to Inj. and Class Certification Mot. Re. Newly Decided

11  Ninth Circuit Decision at 6 ("Defs.' Supp. Mem.").

12       All four plaintiffs claim that these events give rise to

13  three causes of action.  First, they claim that the

14  aforementioned events violated 42 U.S.C. § 1983 by depriving

15  plaintiffs of their Constitutional rights, and particularly (1)

16  the right to be free from infliction of cruel and unusual

17  punishment; (2) the right not to be deprived of liberty without

18  due process of law; (3) the right to be safe and protected from

19  injuries while in defendants' custody; (4) the right to be

20  protected by peace officers while in their control; (5) the right

21  to be free from excessive and unreasonable force; and (6) the

22  right to necessary medical treatment for plaintiffs' serious

23  medical conditions.  Second, plaintiffs claim that the afore-

24  described events show that defendant Larry Carpenter (the former

25  Ventura County Sheriff), Bob Brooks (the current Ventura County

26  Sheriff), and Ken Kipp (the Chief of the Custody Division of the

27  VCSD) failed to train deputy sheriffs, in violation of

28

- 6 -

1  defendants' statutory duty, and that they failed to supervise and
2  investigate deputy sheriffs thereby causing constitutional
3  violations.   Third, plaintiffs claim that the aforementioned
4  events constitute a violation of 42 U.S.C. § 1983 by the
5  defendants because the events constitute an unconstitutional
6  custom or practice causing constitutional violations.   Plaintiffs
7  seek injunctive relief in order to prohibit the defendants from
8  using the Pro-straint chair for purposes for which it was not
9  designed.   Plaintiffs also seek damages.

10     Plaintiff Von Colln filed his complaint on May 27, 1997.
11  Plaintiff Stringer filed his complaint on November 13, 1997.
12  Plaintiff Pratt filed his complaint on April 22, 1998.   Finally,
13  plaintiff Lloyd filed his complaint on July 28, 1998.   On October
14  9, 1998, the Court approved a stipulation consolidating the first
15  three cases.   On March 11, Lloyd v. County of Ventura was
16  transferred to this Court.   On August 11, 1999, all four cases
17  were consolidated.

18     On June 30, 1999, defendants filed four motions for summary
19  judgment against all plaintiffs.   The motions were originally
20  scheduled to be heard on August 30, 1999.   The Court received a
21  consolidated opposition on August 2, 1999.   On August 27, 1999,
22  all four plaintiffs filed (1) a motion for class certification,
23  and (2) a motion for preliminary injunction.   Defendants filed
24  their oppositions to both motions on September 13, 1999.   These
25  motions were originally scheduled to be heard on September 27,
26  1999.   The Court vacated both hearing dates and advised the
27  parties that it would reschedule for a later time.
28

1    On September 1, 1999, the parties stipulated and allowed the

2  plaintiffs to file a "Consolidated Plaintiffs' First Amended

3  Complaint" which deleted the VCSD as a named defendant, added

4  some individual defendants, and named some of the existing

5  defendants in their personal capacity as well as their official

6  capacities.

7    This new complaint prompted defendants to file an additional

8  motion to dismiss the newly added defendants and to dismiss the

9  individual defendants now named in their personal capacity.  The

10  motion was filed on September 29, 1999.  The opposition was filed

11  on October 1, 1999.  The hearing for this motion was originally

12  set for October 25, 1999.

13    On October 18, 1999, the Court vacated the October 25, 1999

14  hearing and rescheduled the hearing for all pending motions to

15  November 1, 1999.  At the hearing, defense counsel advised the

16  Court that a recent Ninth Circuit decision clarified the standing

17  issue in this case.  Defense counsel provided the Court and

18  plaintiffs' counsel with a copy of the opinion and a short brief.

19  An additional hearing was set for November 4, 1999 to address the

20  issues in the new case.  This order addresses all pending

21  motions.

22  **III. ANALYSIS**

23    **A.    STANDING**

24    As a preliminary matter, defendants challenge each

25  plaintiff's standing to seek injunctive relief.  Standing is not

26  merely a pleading requirement, but an indispensable part of the

27  case, and must be established by evidence appropriate for every

28

1  stage of the litigation.  See Lujan v. Defender of Wildlife, 504
2  U.S. 555, 561 (1992).  The standard for determining whether
3  plaintiffs have standing has three elements.  First, the
4  plaintiffs must have suffered an injury in fact.  See Defenders
5  of Wildlife, 504 U.S. at 560.  Second, there must be a causal
6  connection between the injury and the conduct complained of.  See
7  id.  Third, it must be likely that a favorable decision will
8  redress the injury.  See id.  Defendants here claim that
9  plaintiffs do not have standing to obtain the injunction they
10  seek.[1]

11     This inquiry must start with the seminal Supreme Court
12  decision of Los Angeles v. Lyons, 461 U.S. 95 (1983).  In Lyons,
13  plaintiff sued the Los Angeles Police Department ("LAPD") for
14  civil rights violations, seeking both damages and injunctive
15  relief.  See id.  Lyons had been the victim of a "chokehold" and
16  sought both money damages and an injunction which would have
17  prohibited the LAPD from using the chokehold on any other person.
18  See id.  In Lyons, the Supreme Court held that the plaintiff
19  lacked standing to seek injunctive relief absent a sufficient
20  likelihood that he will again be wronged in a similar way.
21  Lyons, 461 U.S. at 109.  Because Lyons was not able to make this
22  showing, the Court found that he lacked standing as to the
23  injunction.  See id.  This opinion, on the surface, seems to
24  decide the issue at hand.  However, the Ninth Circuit has carved
25

26     [1]Defendants only challenge plaintiffs' ability to show "injury
   in fact" and do not dispute that if plaintiffs do show such injury,
27  there is a causal connection between the injury and the conduct
   complained of or that it is likely that a favorable decision will
28  redress the injury.

1  an exception to this rule.  In <u>Giles v. Ackerman</u>, 746 F.2d 614,

2  619 (9th Cir. 1984), the Court held that the plaintiff had

3  standing to request injunctive and declaratory relief simply by

4  virtue of her standing to bring her damage action.  <u>See</u> <u>Giles</u>,

5  746 F.2d at 619.  In <u>Nava v. Dublin</u>, 121 F.3d 453 (9th Cir.

6  1997), the Ninth Circuit reaffirmed that holding.  Specifically,

7  it stated that "[a]fter <u>Giles</u>, in other words, plaintiffs in this

8  Circuit were relieved of the obligation to allege a credible

9  threat of future injury in order to seek forward looking relief

10  so long as they also brought a claim for damages in the same

11  action."  <u>Nava v. Dublin</u>, 121 F.3d 453, 456 (9th Cir. 1997).

12  Cognizant of the breadth of this rule, the Ninth Circuit

13  subsequently limited the exception to situations in which the

14  claim for relief for damages and equitable relief are predicated

15  on the same operative facts and legal theories.  <u>See</u> <u>id.</u>

16      This principle is not without controversy.  The Ninth

17  Circuit is the only one to recognize such an exception.  <u>See</u> <u>id.</u>

18  at 457.  As such, the <u>Nava</u> court applied the exception with

19  reservation, and noted that several Ninth Circuit decisions

20  impliedly declined to apply the rule.  <u>See</u> <u>id.</u> at 457-58 (citing

21  <u>O'Neil v. City of Seattle</u>, 66 F.3d 1064, 1066 (9th Cir. 1995);

22  <u>Thomas v. County of Los Angeles</u>, 978 F.2d 504, 507-08, 511 (9th

23  Cir. 1992); <u>Imagineering, Inc. v. Kiewit Pacific Co.</u>, 976 F.2d

24  1303, 1306-09 (9th Cir. 1992); <u>Nelsen v. King County</u>, 895 F.2d

25  1248, 1249-55 (9th Cir. 1990); <u>Presbyterian Church (U.S.A.) v.</u>

26

27

28

1 <u>United States</u>, 870 F.2d 518, 528-29 (9th Cir. 1989)).[2]  Despite

2 its reservations, however, the <u>Nava</u> Court held that a faithful

3 interpretation of the Ninth Circuit cases creating the exception

4 to <u>Lyons</u> required the court to apply that exception.  <u>Id.</u> at 456.

5 This Court must as well.  Defendants do not challenge, nor can

6 they, that plaintiffs do have standing to sue for the damages

7 they suffered, nor could they argue that plaintiffs' claims for

8 damages and for injunctive relief do not involve the same

9 operative facts and legal theory.  As such, plaintiffs have

10 standing to sue for injunctive relief under <u>Nava</u>.

11     Even if this Court were to address this issue without the

12 guidance of the <u>Giles</u> and <u>Nava</u> decisions, the Court finds that

13 plaintiffs have shown a sufficient personal stake to warrant

14 standing in this case.  The evidence on the record shows that

15

---

16     [2]The recent opinion of the Ninth Circuit, <u>B.C. v. Plumas</u>
<u>Unified School District</u>, 1999 Daily Journal D.A.R. 10807 is another
17 one of these cases which "impliedly" refused to follow Ninth
Circuit precedent set by <u>Giles</u> and <u>Nava</u>.  The <u>B.C.</u> Court never
18 addressed, or even attempted to distinguish, <u>Nava</u>.  As such, there
19 appears to be an intra-circuit split of authority on this issue.
An intra-circuit conflict may be resolved authoritatively only
20 through en banc proceedings.  <u>See</u> <u>United States v. Sotelo-Murillo</u>,
887 F.2d 176, 179 (9th Cir. 1989).  Lacking such clear
21 pronouncement from the Circuit, this Court must look elsewhere for
22 guidance.  The Eleventh Circuit, when faced with a similar dilemma,
held that when circuit authority is in conflict, a court should
23 look to the line of authority containing the earliest case.  <u>See</u>
<u>Johnson v. City of Fort Lauderdale</u>, 126 F.3d 1372, 1380 n.10 (11th
24 Cir. 1997).  That principle was recognized, and accepted, by a
later panel of the Eleventh Circuit in <u>Walker v. Mortham</u>, 158 F.3d
25 1177, 1188 (11th Cir. 1998).  That court held that the "earliest
26 case" rule is the correct one because (1) a decision of a prior
panel cannot be overturned by a later panel, and (2) because of the
27 importance of the prior precedent rule.  <u>See id.</u>  In this case,
<u>Giles</u> was decided in 1984, and <u>Nava</u> was decided in 1997, all before
28 <u>B.C.</u>, which was decided in 1999.

- 11 -

1    plaintiffs' allegations of future injury are not speculative.
2    Although none of the four plaintiffs are currently incarcerated
3    at the Ventura County Jail, defendant Lloyd is in custody at
4    Metropolitan State Hospital awaiting return to Ventura County
5    Jail for trial, and the other three named plaintiffs remain on
6    probation.  See Defs.' Supp. Mem. at 6.  Furthermore, over the
7    past three years, plaintiff Von Colln has been incarcerated twice
8    in the Ventura County Jail, plaintiff Stringer has been
9    incarcerated four times in the Ventura County Jail, and plaintiff
10   Pratt was incarcerated eleven times at the Ventura County Jail.
11   See Maciel Decl. at 2-3.  Finally, plaintiff Lloyd has "literally
12   dozens and dozens of incarceration episodes in the Ventura County
13   Jail system, and it would take several pages to list all the
14   inclusive incarceration dates."  Id. at 3.  Therefore,
15   considering the fact that all but one of the plaintiffs are on
16   probation, combined with their apparent propensity to
17   incarceration in the Ventura County Jail, it is beyond
18   speculation that at least one of the named plaintiffs will be in
19   custody of the Ventura County Jail in the near future.

20        Furthermore, it is also not speculative that the plaintiffs
21   will be subject to unconstitutional treatment when they are
22   returned to the Ventura County Jail.  The defendants' conduct
23   here is both recurrent and presumptively in violation of the
24   plaintiffs' constitutional rights.  The VCSD has a policy in
25   place authorizing the use of the Pro-straint chair for arrestees.
26   See Consolidated Pls.' Mot. Prelim. Inj., Ex. 3 ("Pls.' Ex. 3").
27   Furthermore, the data provided by the VCSD shows a pattern or
28

practice of abuse of that chair.  See generally Burns Decl.  As

such, "[t]he possibility or recurring injury ceases to be

speculative when actual repeated incidents are documented."

Nicacio v. INS, 797 F.2d 700, 702 (9th Cir. 1986).

**B.  CLASS CERTIFICATION**

Plaintiffs move for class certification under Rule 23(a) and

Rule 23(b)(2) of the Federal Rules of Civil Procedure.  Rule

23(a) provides that a district court may certify a class when,

> (1) the class is so numerous that joinder of all
> members is impracticable, (2) there are questions of
> law or fact common to the class, (3) the claims or
> defenses of the representative parties are typical of
> the claims or defenses of the class, and (4) the
> representative parties will fairly and adequately
> protect the interests of the class.

Fed. R. Civ. P. 23(a).  In addition to satisfying the mandates of

Rule 23(a), the proposed class members must also demonstrate that

they meet one of the requirements of Rule 23(b).  In this case,

plaintiffs move under Rule 23(b)(2), which provides that "the

party opposing the class has acted or refused to act on grounds

generally applicable to the class, thereby making appropriate

final injunctive relief or corresponding declaratory relief with

respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The

party moving for certification bears the burden of demonstrating

that it meets Rule 23's requirements.  See Doninger v. Pacific

Northwest Bell, Inc., 564 F.2d 1304, 1308 (9th Cir. 1977).

In deciding a motion for class certification, the district

court exercises its discretion to determine whether or not to

certify a class.  See id. at 1309.  When making this

determination, a district court should bear in mind the two goals

1  behind Rule 23:   Class actions promote judicial economy because

2  they minimize the multiplicity of identical suits, and they

3  permit parties with small claims to assert them when they

4  otherwise might not, because of litigation costs that outweigh

5  any potential recovery.   See Crown Cork & Seal Co. v. Parker, 462

6  U.S. 345, 349 (1983); Rand v. Monsanto Co., 926 F.2d 596, 599

7  (7th Cir. 1991).

8              1.   NUMEROSITY

9       Rule 23(a)(1) requires that "a class is so numerous that

10 joinder of all members is impracticable."  The Supreme Court, in

11 General Telephone Co. v. EEOC, 446 U.S. 318 (1980), held that no

12 specific threshold number for class certification exists, but

13 instead, "[t]he numerosity requirement requires examination of

14 the specific facts of each case."  Id. at 330.  The "exact size

15 of the class need not be known so long as 'general knowledge and

16 common sense indicate that it is large.'"  Perez-Funez v.

17 District Director, 611 F. Supp. 990, 995 (C.D. Cal. 1984)

18 (quoting Orantes-Hernandez v. Smith, 541 F. Supp. 351, 370 (C.D.

19 Cal. 1982)).

20      According to the defendants, approximately 30,000 arrestees

21 are booked annually at the Ventura County Jail.  See Defendants'

22 Opp'n to Pls.' Mot. for Class Certification at 24-25.  Out of all

23 those arrestees, plaintiffs have provided evidence that the chair

24 was used approximately 377 times (312 times by defendants'

25 account) over an 18 month period.  See Burns Decl. in Supp. of

26 Mot. Class Certification and Prelim. Inj. at 1.[3]  Understandably,

27

28       [3]Katherine Burns conducted an analysis of approximately 4,000
   pages of documents provided by the VCSD.  These documents recorded

1   given that inmates are continuously brought in and out of the

2   facility, the number fluctuates over time.  All things being

3   equal, however, the number of inmates subject to similar

4   treatment in the next eighteen months will not be significantly

5   different, and any figure in the three-hundred range certainly

6   qualifies as a class in which joinder of all the members would be

7   impractical.  Furthermore, the purported class seeks to represent

8   inmates who have been, are, and will be subject to confinement in

9   the chair.  Therefore, the Court finds that the plaintiffs meet

10   this first factor.

11          **2.   COMMONALITY**

12          Ensuring that a class is not over-inclusive, Rule 23(a)(2)

13   requires that "there are questions of law or fact common to the

14   class."  Fed. R. Civ. P. 23(a)(2).  The members of the class do

15   not have to share every question of law or fact in common, but

16   "issues . . . common to the class as a whole" must exist and

17   "turn on questions of law applicable in the same manner to each

18   member of the class."  <u>Califano v. Yamasaki</u>, 442 U.S. 682, 700-01

19   (1979).  Accordingly, the existence of individual issues

20   remaining "after the common questions of the defendant's

21   liability have been resolved does not dictate the conclusion that

22   a class action is impermissible."  <u>Sterling v. Velsicol Chem.</u>

23   <u>Corp.</u>, 855 F.2d 1188, 1197 (6th Cir. 1988).  Therefore,

24

25   the reasons, as documented by the deputies and nurses, arrestees

26   were placed in the chair, and for how long they remained in the
     chair.  <u>See</u> Burns Decl. at 1.  These documents were turned over by

27   the Sheriff's Department as a result of a discovery order issued by
     Magistrate Judge Woehrle, and were intended to serve as a sampling

28   for the purpose of this litigation.  Defendants do not dispute the
     accuracy of the report.

- 15 -

1   commonality is met when the court is convinced that class members

2   share enough issues that predominate over their claims that a

3   class action is the most efficient method for adjudicating those

4   claims.  See Califano, 442 U.S. at 701.

5       Nevertheless, courts have struggled to formulate a standard

6   for determining when proposed class members share enough common

7   issues to warrant certification.  In two recent civil rights

8   decisions, the Ninth Circuit recognized that when proposed

9   members are moving for certification under Rule 23(a) in

10  conjunction with Rule 23(b)(2), a district court may relax the

11  commonality requirement.  See Hodgers-Duran v. Vina, 165 F.3d

12  667, 675-79 (9th Cir. 1999); Walters v. Reno, 145 F.3d 1032,

13  1045-48 (9th Cir. 1998), cert. denied, 119 S. Ct. 1140 (1999).

14  These decisions appear to follow the Third and Seventh Circuits'

15  lead in liberalizing Rule 23(a)(2)'s commonality standard by

16  stressing shared interests rather than differences among proposed

17  class members that seek declaratory or injunctive relief.  See

18  Hodgers-Duran v. Vina, 165 F.3d at 678-79 (citing Baby Neal v.

19  Casey, 43 F.3d 48, 56-57 (3d Cir. 1994); Alliance to End

20  Repression v. Rochford, 565 F.2d 975, 976 (7th Cir. 1977)).

21      Under Rule 23(b)(2), commonality exists if plaintiffs share

22  a common harm or violation of their rights, even if

23  individualized facts supporting the alleged harm or violation

24  diverge.  Conversely, shared core facts support a commonality

25  finding, even if plaintiffs assert disparate legal remedies.

26  These holdings sit squarely with the Advisory Committee Notes to

27  Rule 23, which state that Rule 23(b)(2) enables the prosecution

28  of civil rights actions seeking declaratory or injunctive relief.

1  See Fed. R. Civ. P. 23(b)(2) (Advisory Committee Notes); Walters

2  v. Reno, 145 F.3d 1032, 1046 (9th Cir. 1998) (noting that Rule

3  23(b)(2) facilitates civil rights actions).  In these types of

4  cases, class members typically aim to invalidate a law or

5  practice on constitutional or statutory grounds.  The central

6  showing in these suits is that the class members share a general,

7  common violation, rather than a unitary claim premised on

8  identical facts or legal remedies.  In short, when addressing

9  commonality of class members proposed under Rule 23(b)(2), a

10  court may employ a liberal definition of commonality.

11      The Court finds that plaintiffs' causes of action do involve

12  common questions of law--i.e., whether the Ventura County

13  practice of using the Pro-straint chair violates an arrestee's

14  constitutional and statutory rights.  Therefore, the Court finds

15  that "there are questions of law or fact common to the class."

16  Fed. R. Civ. P. 23(a).

17          3.  TYPICALITY.

18      Ensuring that a class is not under-inclusive, Rule 23(a)(3)

19  requires that "the claims or defenses of the representative

20  parties are typical of the claims or defenses of the class."

21  Fed. R. Civ. P. 23(a)(3).  "'The typicality inquiry is intended

22  to assess whether the action can be efficiently maintained as a

23  class and whether the named plaintiffs have incentives that align

24  with those of absent class members so . . . that the absentees'

25  interests will be fairly represented'"  Hodgers-Durgin v. Vina,

26  165 F.3d 667, 679 (9th Cir. 1999) (quoting Baby Neal v. Casey, 43

27  F.3d 48, 57 (3d Cir. 1994)).  Under this factor, a district court

28  must inquire as to whether the named plaintiffs' individual

1  circumstances markedly diverge or whether the legal theories and
2  claims differ as to defeat the purposes of maintaining a class.
3  See id. (quoting Baby Neal, 43 F.3d at 57-58).  However, varying
4  factual differences between the claims or defenses of the class
5  and the class representatives will not necessarily render the
6  named representatives' claim atypical.  See Smith v. B & O R.R.,
7  473 F. Supp. 572, 581 (D. Md. 1979).  A finding of commonality
8  frequently supports a finding of typicality.  See General Tel.
9  Co. v. Falcon, 457 U.S. 147, 157 n.13 (1982) (noting how the
10 commonality and typicality requirements "merge").

11      Plaintiffs propose a class of past, current, and future
12 detainees of the Ventura County Jail.  These plaintiffs are
13 challenging the county's use of the Pro-straint chair.  They are
14 not asserting claims grounded in unique, idiosyncratic facts as
15 to create an under-inclusive class.  If it is found that the
16 policies of the VCSD associated with the use of the chair are in
17 violation of the inmates' constitutional or statutory rights,
18 then that policy would be unconstitutional as to all Ventura
19 County Jail detainees.  Moreover, plaintiffs pray for injunctive
20 relief that would affect every Ventura County detainee subject to
21 the use of the Pro-straint chair.  They do not request relief
22 that requires the Court to make an inquiry into the facts
23 surrounding each plaintiffs' claims.  All these factors support
24 the typicality showing.

25      Defendants do not squarely challenge that this requirement
26 has not been met.  They do assert that some of the named
27 plaintiffs did not urinate or defecate on themselves, and that
28 some of the factual circumstances of the named plaintiffs'

1  placement in the chair were different.  See Defs.' Opp'n to Pls.'
2  Mot. Class Certification at 3-8.  Defendants, however, miss the
3  point.  The issue here is whether the policy and practices
4  associated with the use of the chair violate the arrestees'
5  rights as guaranteed by the Constitution and statutes.  Each
6  plaintiff represented here has been subjected to such policy.  As
7  such, the element of typicality is met.

8           **4.  ADEQUACY OF REPRESENTATION.**

9       Rule 23(a)(4) requires that "the representative parties will
10  fairly and adequately protect the interests of the class."  Fed.
11  R. Civ. P. 23(a)(4).  This requirement "serves to uncover
12  conflicts of interest between named parties and the class they
13  seek to represent."  Amchem Prod., Inc. v. Windsor, 521 U.S. 591,
14  625 (1997).  In the Ninth Circuit, representation is "adequate"
15  when counsel for the class is qualified and competent, the
16  representatives' interests are not antagonistic to the interests
17  of absent members, and the action is not collusive in nature.
18  See Dalkon Shield IUD Prod. Liab. Litig., 693 F.2d 847, 855 (9th
19  Cir. 1982).

20      Defendants do not dispute this factor.  As discussed above,
21  the named plaintiffs and the class members raise identical
22  claims, and no evidence exists to suggest that the
23  representatives are antagonistic to other members of the class.
24  Furthermore, plaintiffs' counsel specializes in civil rights and
25  consumer rights litigation and has broad experience in suits
26  challenging initiatives.  See Paz Decl. at 1-2.  Accordingly, the
27  Court finds that plaintiffs have met this fourth factor.
28  ///

                              - 19 -

1         **5.   RULE 23(b)(2).**

2         In addition to Rule 23(a)'s requirements, plaintiffs must

3    also satisfy one of the requirements outlined in Rule 23(b).  <u>See</u>

4    Fed. R. Civ. P. 23(b).  Plaintiffs move for class certification

5    under Rule 23(b)(2), which provides that "the party opposing the

6    class has acted or refused to act on grounds generally applicable

7    to the class, thereby making appropriate final injunctive relief

8    or corresponding declaratory relief with respect to the class as

9    a whole."  Fed. R. Civ. P. 23(b)(2).  The Advisory Committee

10   Notes to Rule 23 recognize that subdivision (b)(2) enables the

11   prosecution of civil rights claims.  <u>See</u> Fed. R. Civ. P. 23(b)(2)

12   (Advisory Committee Notes); <u>Walters v. Reno</u>, 145 F.3d 1032, 1047

13   (9th Cir. 1999) (noting how Rule 23(b)(2) facilitates civil

14   rights actions).

15        Defendants claim that the proposed class certification is

16   improper because the plaintiffs are primarily seeking money

17   damages.  To support their argument, defendants claim that (1)

18   the pursuit of injunctive relief is illusory; (2) plaintiffs lack

19   standing; and (3) the plaintiffs cannot possibly be seeking

20   injunctive relief because they are no longer in custody.  The

21   Court addresses these arguments <u>seriatim</u>.

22              **a.   Injunctive Relief is not Illusory**

23        Disputes over whether the action primarily seeks injunctive

24   relief rather than money damages neither promote the disposition

25   of the case on the merits nor represent a useful expenditure of

26   energy.  <u>See</u> 7A Wright et al., Federal Practice and Procedure §

27   1775, at 470 (2d ed. 1986).  Therefore, they should be avoided.

28   <u>See id.</u>  If the Rule 23(a) prerequisites have been met and

injunctive relief has been requested, the action should be
allowed to proceed under subdivision (b)(2). See id. It is true
that injunctive relief, in a Rule 23(b)(2) class, must be the
primary goal of the cause of action. See Probe v. State
Teachers' Retirement Sys., 780 F.2d 776, 780 (9th Cir. 1986).
Nonetheless, most of the reported cases dealing with this
"predominance" issue have done so conclusorily and have not
enunciated clear rules for applying the test. See Arnold v.
United Artist Theater Circuit, Inc., 158 F.R.D. 439, 451 (N.D.
Cal. 1994) (citing 1 H. Newberg, Class Actions § 4.14, at 4-49
(3d. ed 1992)). Nevertheless, the hallmark of a 23(b)(2) class
action is homogeneity. See Arnold, 158 F.R.D. at 451. It is
this characteristic that allows the court to dispense with the
notice requirement and bind all members to a judgment on the
merits without an opportunity to opt out. See id. For example,
in class actions alleging employment discrimination, homogeneity
is usually ensured because the defendant's allegedly
discriminatory conduct affects the class as a whole, and makes
final injunctive relief appropriate. See Weitzel v. Liberty
Mutual Ins. Co., 508 F.2d 239, 250, 253 (3d Cir. 1975); Arnold,
158 F.R.D. at 451. This interpretation of the policy concerns
underlying the restrictions on the sorts of suits that may be
certified under Rule 23(b)(2) is supported by the fact that civil
rights class actions are generally certified under the Rule. See
Arnold, 158 F.R.D. at 452. In analyzing the claims at hand, it
is clear that the claims of the class members are extremely
homogeneous. Here, the class members all challenge the same
behavior: the policy and practices associated with the use of the

- 21 -

1  Pro-straint chair.  The use of the chair affects all class
2  members in almost precisely the same way because of common
3  distinguishing characteristics: they are all arrestees in a
4  particular county jail who are subject to the same
5  unconstitutional treatment.  This fact lends the proposed class
6  an extraordinary level of homogeneity, far greater than most
7  Title VII actions, which often allege that many separate actions
8  against individuals manifest a common pattern and practice of
9  discrimination.  See id.  In light of this high degree of
10 homogeneity, it is clear that this suit is a paradigm of the type
11 of action for which the (b)(2) form was created.

12     Furthermore, this principle of predominance has been applied
13 in cases where plaintiffs sought to incorporate the damage
14 portion of their claim into the Rule 23(b)(2) certification.  It
15 is not the case here.  Plaintiffs only seek class status as to
16 the injunctive relief claim.  Furthermore, it is within the
17 discretion of the trial judge to limit the issues in a class
18 action to "those parts of a lawsuit which lend themselves to
19 convenient use of the class action motif."  Society for
20 Individual Rights, Inc. v. Hampton, 528 F.2d 905, 906 (9th Cir.
21 1975).  As such, this Court finds that the class can be certified
22 under Rule 23(b)(2) as to the injunctive remedy only.

23                    b.   Standing

24     Next, defendants allege that plaintiffs will not be able to
25 succeed on their claim for an injunction because they lack
26 standing to seek such an injunction.  This argument was addressed
27 above.   Under the aforementioned analysis, the Court finds that
28 plaintiffs do have standing to bring this injunction.

1                          c.    **Actual Recovery**

2        Next, defendants argue that even if plaintiffs establish

3   standing, they will not be able to recover prospective relief

4   because they are not likely to establish "that a credible threat

5   exists that they will again be subject to the specific injury for

6   which they seek injunctive or declaratory relief."  Buritica v.

7   United States, 8 F. Supp. 2d 1188, 1196 (N.D. Cal. 1998).  What

8   defendants argue here is that the plaintiffs will not be able to

9   succeed on the merits of the injunction.

10       In considering a motion for class certification, the Court

11  should not make a preliminary determination on the merits of the

12  action.  See Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 178

13  (1974).  Indeed, in determining the propriety of a class action,

14  the question is not whether the plaintiffs have stated a cause of

15  action or will prevail on the merits, but rather whether the

16  requirements of Rule 23 are met.  See id. at 177-178.  As such,

17  the Court is bound to take the substantive allegations in the

18  complaint as true.  See Blackie v. Barrack, 524 F.2d 891, 901

19  n.17 (9th Cir. 1975).

20       The complaint alleges that plaintiffs fear that they will be

21  deprived again of all decency and privacy, and be forced to

22  endure inhumane pain, cramps and indignity while forced to

23  withhold voiding of urine and feces.  See Consolidated Pls.'

24  First Am. Compl. at 6,7-8, 9-10.  On its face, the complaint

25  alleges enough to sustain plaintiffs' demand of injunctive

26  relief.  As such, a discussion of the merits of plaintiffs' claim

27  is inappropriate at this juncture.

28  ///

whose edicts or acts may fairly be said to represent official
policy.'" See id. at 784-85 (quoting Monell, 436 U.S. at 694).
As such, this Court's task is to identify those officials "who
speak with final policymaking authority for the local
governmental actor concerning the action alleged to have caused
the particular constitutional or statutory violation at issue."
Id.; Jett v. Dallas Indep. School Dist., 491 U.S. 701, 737
(1989).  Therefore, the dispute here is whether the county or the
state is the final policymaker as to the conduct complained of by
plaintiffs.  Such a determination is a matter of law.  See Pitts
v. County of Kern, 17 Cal. 4th 340, 357 (1998).

In deciding this dispute, the McMillian Court instructs this
Court to guide its inquiry according to two principles.  See
McMillian, 520 U.S. at 785.  First, the Court must look at the
specific activity at issue and determine whether the Sheriff acts
as a state or county policymaker in that respect only.  See id.
at 785-86.  Second, the Court must analyze state law to determine
whether the official has "final policymaking authority."  See id.
at 786 (citing Jett, 491 U.S. at 737).

The specific activity at issue here is the day-to-day
operation of the County Jail.  Therefore, the Court must
determine whether the Sheriff acts as a county or state
policymaker in that respect only.  The California Court of
Appeals has already had the opportunity to address whether the
Sheriff was a state or county officer in some respects.  See
County of Los Angeles v. Superior Court, 68 Cal. App. 4th 1166
(1998) (Peters).  In that case, the California court ruled that
the Sheriff was acting pursuant to his "law enforcement function"

- 40 -

1   when he refused to release an inmate who may have been subject to

2   an outstanding warrant.  See id. at 1177.[10]  The fact that the

3   Sheriff was acting pursuant to his law enforcement function in

4   relying on a warrant made the Sheriff a state actor.[11]  That

5   case, however illustrative, is not controlling here.  The acts

6   complained of in the instant complaint do not arise out of the

7   Sheriff's law enforcement functions, but rather out of his

8   "responsibility for operating jails."  See Cal. Pen. Code § 4000.

9   Part of that responsibility involves the making of policies for

10  the keeping of inmates and arrestees.

11       Furthermore, an analysis of California law shows that the

12  sheriff acts as a county policymaker in his operation of the

13  jails.  California Government Code section 24000(b) states that

14  the Sheriff is a county officer.  See Cal. Gov. Code. § 24000(b).

15

16       [10]In Peters, the court heavily relied on Pitts v. County of
    Kern, 17 Cal. 4th 340 (1998).  That case stood for the proposition
17  that county prosecutors, when prosecuting criminal cases, and
    therefore acting in their law enforcement capacity, were acting
18  under color of state law.  See id. at 356-58.  This was evidenced
    by the fact that the Attorney General had direct supervisory
19  authority over the county prosecutors when they acted in their law
    enforcement function.  See id.  The Peters court then analogized
20  that when county sheriffs act in their law enforcement capacity,
    they too are acting under color of state law.  See Peters, 68 Cal
21  App. 4th at 1171.
22

23       [11]Defense counsel urges this Court that Peters stands for the
    proposition that sheriffs are immune from civil rights lawsuits
24  both when acting in their law enforcement function and when they
    are acting in the day-to-day management of their jail.  As
25  discussed above, the Court does not read Peters quite as broadly as
    defendant does.  In any event, even if Peters stood for the
26  proposition that sheriffs are immune from civil rights lawsuits
    which result from their conduct in running the day-to-day
27  operations of a jail, this Court rejects that holding, as it
28  clearly violates the analytical framework enunciated by the Supreme
    Court in McMillian.

- 41 -

## 6.   DEFINITION OF THE CLASS

Therefore, the Court finds that plaintiffs have met all the requirements to warrant class certification in this case. However, the class sought is certified only with respect to the injunctive portion of the case.  Namely, the class is composed of all individuals who are currently incarcerated, or will be incarcerated during the pendency of this lawsuit, in the Ventura County jail, and who are subject to being restrained in the Pro-straint chair in violation of their Eighth Amendment rights. Issues of damages for past use of the chair will be addressed individually.

### C.   PRELIMINARY INJUNCTION

#### 1.   LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS.

The Supreme Court "has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." Weinberger v. Romeo-Barcelo, 456 U.S. 305, 312 (1982).  The limited record usually available on these motions renders a final decision on the merits inappropriate.  See Brown v. Chote, 411 U.S. 452, 456 (1973).

In the Ninth Circuit, two interrelated tests exist for determining the propriety of the issuance of a preliminary injunction.  Under the first test, the Court may not issue a preliminary injunction unless:  (1) the moving party has established a strong likelihood of success on the merits; (2) the moving party will suffer irreparable injury and has no adequate remedy at law if injunctive relief is not granted; (3) the balance of hardships tips in favor of the movant; and (4)

- 24 -

1   granting the injunction is in the public interest.  See <u>Martin</u>
2   <u>Int'l Olympic Comm.</u>, 740 F.2d 670, 674-75 (1984) <u>Greene v. Bowen</u>,
3   639 F. Supp. 554, 558 (E.D. Ca. 1986).  An alternative
4   articulation of the test is whether the moving party "meet[s] its
5   burden by demonstrating either a combination of probable success
6   on the merits and the possibility of irreparable injury or that
7   serious questions are raised and the balance of hardships tips
8   sharply in its favor."  <u>Martin</u>, 740 F.2d at 675.  The two tests
9   are not, however, separate and unrelated.  Each represents the
10  "extremes of a single continuum."  <u>Benda v. Grand Lodge of Int'l</u>
11  <u>Ass'n of Machinists</u>, 584 F.2d 308, 315 (9th Cir. 1978).

12              2.   APPLICATION

13                   a.   Likelihood of success

14       Plaintiffs here are pre-trial detainees who allege
15  violations of their Eighth and Fourteenth Amendment rights.
16  Claims by pre-trial detainees are analyzed under the Fourteenth
17  Amendment Due Process Clause rather than under the Eighth
18  Amendment.  See <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 n.16 (1979).
19  However, because pre-trial detainees' rights under the Fourteenth
20  Amendment are comparable to prisoners' rights under the Eighth
21  Amendment, courts apply the same standard.  See <u>Frost v. Agnos</u>,
22  152 F.3d 1124, 1128 (9th Cir. 1998).

23       The history of the constitutional prohibition of "cruel and
24  unusual punishment" has been recounted at length in prior Supreme
25  Court opinions and need not be repeated here.  See, e.g., <u>Estelle</u>
26  <u>v. Gamble</u>, 429 U.S. 97, 102 (1976); <u>Gregg v. Georgia</u>, 428 U.S.
27  153, 169-73 (1976).  It suffices to say that the primary concern
28  of the Drafters was to prohibit tortures and other barbarous

methods of punishment. See Estelle, 429 U.S. at 102.  More
recent cases, however, have held that the Amendment "proscribes
more than physically barbarous punishments." See Gregg, 428 U.S.
at 171.  The Amendment embodies "broad and idealistic concepts of
dignity, civilized standards, humanity and decency . . . against
which we must evaluate penal measures.  Thus, [the Supreme Court]
ha[s] held repugnant to the Eighth Amendment punishments which
are incompatible with 'the evolving standards of decency that
mark the progress of a maturing society.'" Estelle, 429 U.S. at
102 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality
opinion)).  Furthermore, the Supreme Court has also held that the
Amendment protects from punishments which "involve the
unnecessary and wanton infliction of pain." Gregg, 428 U.S. at
173.  Among unnecessary and wanton infliction of pain are those
that are "totally without penological justification." Id. at
183; Estelle, 429 U.S. at 103; Rhodes v. Chapman, 452 U.S. 337,
346 (1981).

No static test can exist by which courts determine whether
conditions of confinement are cruel and unusual, for the Eighth
Amendment "must draw its meaning from the evolving standards of
decency that mark the progress of a maturing society." Trop, 356
U.S. at 101 (plurality opinion).  In Spain v. Procunier, 600 F.2d
189, 197 (9th Cir. 1979), the Ninth Circuit upheld an injunction
against the Director of the California State Department of
Correction, thereby prohibiting the Director from using
mechanical restraining devices[4] on prisoners when they traveled

_____

[4]The "mechanical restraining devices" referred to in Spain
were: handcuffs, a waist chain to which the cuffs were attached by

- 26 -

from a high-security area of the prison for court appearances or
family visits. See id. The trial court in that case found that
the use of these devices for all out of cell movement was
"dehumanizing" and that it was cruel and unusual punishment. See
id. The Ninth Circuit agreed with the trial court's
determination and held that "[i]f the physical or mental pain
that results [from the use of neck chains] is cruel and unusual,
it is a violation of the Eighth Amendment regardless of the
intent or the purpose of those who inflict it." See id.[5] In
conclusion, the court held that mechanical restraints could not
be used to punish inmates. See id. at 198.

In light of that standard, the Court analyzes defendants'
use of the Pro-straint chair to determine whether plaintiffs have
a strong likelihood of success on the merit of their Fourteenth
Amendment claim. Plaintiffs, through Katherine Burns, reviewed
and summarized documents provided by the VCSD in discovery. See
Burns Decl. at 5. These documents covered an eighteen month
period and consisted of (1) Jail Incident Reports, (2) Inmate
Monitoring Logs, and (3) California forensic medical group
records. See id. at 5. These three types of documents catalog
the instances when the deputy sheriffs used the Pro-straint
chair. See id. at 5. Burns's review of the material showed that
from May 1, 1996 to December 1, 1997, the Pro-straint chair was

---

a chain, leg manacles, and a neck chain consisting of a chain
attached to the back of the waist chain and extending over one
shoulder, across the neck, over to the other shoulder and down the
back.

[5]The Ninth Circuit did, however, differ in opinion as to the
scope of the remedy granted by the trial court.

- 27 -

1  used 377 times.  See id. at 5.

2      Burns divided the data into two major categories: (1)
3  arrestees whose record did not reveal a history of mental health
4  problems; and (2) arrestees who did.  See id. at 5.  Out of the
5  202 persons who were restrained in the chair who did not have a
6  history of mental health problems, 196 of them were restrained
7  only once.  See id.  The other six of them were confined on
8  multiple occasions.  See id.  In total, the documents reflected
9  that the chair was used 258 times.  See id. at 6.  Out of those
10 258 occasions, Burns found that there were only three occasions
11 where the arrestees showed signs of "violence toward another" or
12 "fighting."  See id. at 6.  Other explanations for confining
13 arrestees to the chair were "kicking cell walls," "bad attitude,"
14 "resistance," or conduct which allegedly occurred during arrest
15 but not in the presence of the deputies.  See id. at 6.
16 Furthermore, plaintiffs' review of the documents showed that out
17 of those 196 persons who were placed in the chair only once, 168
18 were in the chair more than three hours; 33 were in the chair
19 more than eight hours; 16 persons were kept in the chair between
20 eight and ten hours; and 17 persons were kept in the chair
21 between ten and twenty hours.  See id. at 6.

22     Out of the 72 people who were restrained in the chair and
23 had a history of mental health problems, 60 of them were placed
24 in the chair only once while twelve 12 of them were placed in the
25 chair on multiple occasions.  See id. at 6.  In total, the
26 documents reflected that the chair was used 119 times.  See id.
27 The reasons for restraint were predominantly for "kicking cell
28 walls," "bad attitude," or "resistance."  See id. at 8.  Only one

- 28 -

1   incident reports "violence toward another."  See id. at 8.

2   Furthermore, out of the arrestees who were placed in the chair

3   only once, 26 were restrained for six hours or more; 8 were

4   restrained between six and eight hours; 10 persons were kept in

5   the chair between eight to ten hours; 6 persons between ten and

6   twenty hours; and 2 persons for over twenty hours.  See id.

7   According to one report, an arrestee was restrained for almost

8   thirty-five hours because he allegedly continued to use a buzzer

9   to speak to a sergeant.  See id. at n.18.

10      Additionally, plaintiffs provided evidence that there are

11  times when detainees are forced to either withhold bowel

12  movements, or are left to sit in their own feces and urine for

13  hours.  See Maciel Dep. at 87, Ex. 5, attached to Pls.'

14  Consolidated Mot. for Prelim. Inj.  Some have no choice but to

15  defecate and urinate on themselves while sitting in the chair.

16  See Ball Decl. at 8 ("it is seldom that an inmate defecates or

17  urinates on himself"); Worthy Decl. at 6 ("there may have been a

18  few occasions where an inmate urinated while sitting in the

19  chair").

20      Nonetheless, defendants argue that the use of the chair is

21  the "most reasonable method invented to date" to control violent

22  individuals.  Ball Decl. at 1.  They also argue that it was

23  "designed as a humane, violent-prisoner restraint device."  Ball

24  Decl. at 4.  Furthermore, Deputy Worthy states that the chair is

25  used "only as a last resort for an extremely violent or combative

26  inmate."  Worthy Decl. at 6.  The plaintiffs, and the VCSD's own

27  documents, however, tell another story.

28  ///

1   As to the named plaintiffs, Stringer was not placed in the
2   chair "as a last resort for an extremely violent or combative
3   inmate." When Stringer was brought in the County Jail, Stringer
4   was originally placed in the safety cell at 4:03 a.m. because of
5   some suicidal statements he allegedly made. See Defs.' Ex. Sup.
6   Opp'n Prelim. Inj., Ex. L. At 7:20 a.m., Stringer was observed
7   lying peacefully. See id. Within ten minutes, however, Stringer
8   was "kicking the wall" of the safety cell. See id. When he was
9   told to stop, Stringer yelled "fuck you" at the deputy. See id.
10  He was told to stop yelling by one of the deputies, at which
11  point Stringer allegedly stood in a "fighting stance." See id.
12  Apparently frightened by Stringer's "fighting stance" behind a
13  locked metal door, the officers felt it was then necessary to
14  place Stringer in the Pro-straint chair. However, about twelve
15  minutes after he was placed in the chair, Stinger was observed
16  sleeping. See id. All the reports afterwards describe Stringer
17  as drinking water, talking, or just being quiet. See id. Yet,
18  he was released from the chair at 12:18 p.m., or almost five
19  hours after he was placed there. See id. These observations,
20  taken directly from the defendant's documents, do not describe
21  the behavior of a combative, violent, out of control inmate for
22  which the chair is intended.

23  As to Pratt, the Jail Incident Report states that Pratt had
24  been combative with the arresting officers. See Defs.' Ex. Sup.
25  Opp'n Prelim. Inj., Ex. M. After he was brought in, the report
26  states that he appeared "agitated." See id. The report further
27  states that Pratt "would not follow instructions" when deputies
28  attempted to remove his handcuffs. See id. However, Pratt had

shown no signs of violence toward the deputies at the county intake facility. See id. Nevertheless, Pratt was placed in the Pro-straint chair. See id. The only reported incidents of "violence" on the part of Pratt occurred while the deputies tried to place him in the chair. See id.

As to Von Colln, the Jail Incident Report states that Von Colln was hitting his fist against the cell window. See Defs.' Ex. Sup. Opp'n Prelim. Inj., Ex. K. The report further states that Von Colln then removed all his clothes. See id. When he was told to put his clothes back on, Von Colln allegedly refused. See id. Two deputies walked in the cell to force him to put his clothes on. See id. Von Colln then allegedly raised his hand, which prompted the deputies to take him to the ground. See id. As a result, Von Colln was placed in the chair, naked. See id. He was placed in the chair at 7:29 a.m. See id. The observation log shows that after he was placed in the chair, Von Colln was "sitting," "looking up," "talking," and "singing." See id. Yet, he was removed from the chair at 1:10 p.m., almost six hours after being placed there. See id.[6]

In addition to the named plaintiffs' accounts, according to the sheriff's own documents, placement in the chair was justified by a lot less than combativeness or extreme violence. For example, arrestees were placed in the chair for "banging on windows," "pounding on glass," "kicking door," "uncooperative[ness]," "banging on walls, bunk and doors,"

---

[6]The VCSD did not provide any documentation relating to Lloyd's confinement in the chair because, according to the complaint, they were either lost, destroyed, or never made. See Consolidated Pls.'s First Am. Compl. at 10

1  "exhibiting bizarre behavior, fail[ing] to respond to commands,
2  [and] self-destructive[ness]," "banging on door," "bizarre
3  behavior," "possible seizures," "threats to staff and [] cell
4  door would not lock," "pounding on door, threaten[ing] staff and
5  refus[ing] to follow commands," "creating disturbance, threats,"
6  and so on.  See Defs.'s Ex. Sup. Opp'n Prelim. Inj., Ex. Q.
7  These are signs of bad attitude, not signs of violence.  To use
8  the chair because the arrestee has a bad attitude is tantamount
9  to using the chair as a form of punishment.

10      However, the preliminary finding that there are ongoing
11  violations of the Eighth/Fourteenth Amendment does not
12  automatically require that an injunction be issued to stop the
13  conduct.  See Easyriders Freedom, 92 F.3d at 1500.  "[P]rinciples
14  of equity, comity, and federalism . . . should inform the
15  judgment of federal courts when asked to oversee state law
16  enforcement authorities."  Lyons, 461 U.S. at 112.  In order to
17  enjoin a state agency, the Supreme Court requires a showing of an
18  intentional and pervasive pattern of misconduct.  See Easyriders,
19  92 F.3d at 1500.  "Such a pervasive pattern of misconduct can be
20  demonstrated by showing 'that the police misconduct flowed from a
21  policy [or] plan.'"  See id. (quoting Thomas v. County of Los
22  Angeles, 978 F.2d 504, 508 (9th Cir. 1993)).  Such showing has
23  preliminarily been made here.  There is a written policy in
24  effect for the use and operation of the Pro-straint chair.  See
25  Pls.' Ex. 3.  Sergeant Maciel, the person designated as "most
26  knowledgeable" on the use and misuse of the chair, testified that
27  the policy of using the chair is developed solely by the Ventura
28  County Jail.  See Maciel Dep.  Although the policy prohibits the

1 use of the chair for punishment purposes, the term "punishment"
2 itself is not defined in the policy, thereby giving the
3 supervisors--who are present whenever an inmate is to be placed
4 into the Pro-straint chair--full discretion in the use of the
5 chair.  See Maciel Dep. at 37; Pls.' Ex. 3.  Additionally, the
6 policy does not provide for maximum allowable time spent on the
7 chair, thereby giving supervisors full discretion as to how long
8 arrestees remain restrained.  See Pls.' Ex. 3.  Finally,
9 according to Sergeant Maciel, the policy allows deputies to
10 require restrained arrestees to either urinate or defecate on
11 themselves and be forced to sit in their own feces or "hold it."
12 See Maciel Dep. at 80, 87 ("Q. And those guidelines have no
13 provisions for allowing inmates to urinate or defecate when they
14 are placed on the chair; is that true?  A. They can urinate and
15 defecate in that chair.").  Moreover, the data compiled by Burns
16 preliminarily shows that the VCSD's misuse of that chair flows
17 from a practice of restraining non-violent arrestees for extended
18 periods of time in violation of the arrestees' Fourteenth
19 Amendment rights.

20 As such, plaintiffs have shown a strong likelihood of
21 success on the merits.  The parties should bear in mind, however,
22 that the Court is not making a final determination as to whether
23 the use of the chair by the VCSD violates the Fourteenth
24 Amendment.  According to the evidence that was presented to it,
25 the Court is only able to assess the likelihood of plaintiffs'
26 success on this limited record.
27 ///
28 ///

1                          b.   Irreparable Injury

2          Defendants argue that plaintiffs are not entitled to a

3    preliminary injunction because they cannot show that they stand

4    to suffer irreparable injury for which there would be no adequate

5    remedy at law.  See Defs.' Mem. P. & A. Opp'n Prelim. Inj. at 15.

6    Defendants do not argue that pain and suffering is not

7    irreparable harm, nor could they.  Rather they argue that the

8    named plaintiffs, who are no longer incarcerated in the Ventura

9    County jail, are not subject to being placed in the chair, and

10   therefore are unlikely to face irreparable injury if the

11   injunction is not granted.

12         To support their contention, defendants cite to Nava v. City

13   of Dublin, 121 F.3d 453 (9th Cir. 1996).  The Court in Nava held

14   that even though a plaintiff may have standing to seek an

15   injunction, his ability to actually obtain equitable remedies

16   depends on his ability to make "'a showing of irreparable injury,

17   a requirement that cannot be met where there is no showing of any

18   real and immediate threat that the plaintiff will be wronged

19   again--a "likelihood of substantial and immediate irreparable

20   injury."'"  Nava, 121 F.3d at 459 (quoting Lyons, 461 U.S. at 111

21   (citations omitted)).  That principle has universally been

22   recognized in virtually all circuits, and this Court is in no

23   position to disagree with it.  However, defendants seem to rely

24   on one particular phrase in Nava which states that "[e]ven in the

25   face of unconstitutional conduct on the part of state law

26   enforcement officers, an injunction may not be issued to halt

27   that conduct absent a great and immediate threat that the named

28   plaintiff will suffer irreparable injury for which there would be

                                 - 34 -

an inadequate remedy at law." <u>Nava</u>, 121 F.3d at 458 (emphasis added) (citing <u>Easyriders Freedom</u>, 92 F.3d at 1495-96 & n.5, 1500). However, neither the <u>Nava</u> court, nor the <u>Easyriders Freedom</u> Court, had before it a certified class. Therefore, any mention of irreparable harm to the named plaintiff is dicta.

Here, the plaintiff class has been certified as "all individuals incarcerated during the pendency of this lawsuit, in the Ventura County Jail, and who are subject to being restrained in the Pro-straint chair in violation of their Fourteenth Amendment rights." Certainly, these putative plaintiffs are subject to a real and immediate threat that they will be wronged by being placed in the chair. Therefore, plaintiffs have met that prong as well.

### c.   Balance of Hardships

The balance of hardships here tips in favor of plaintiffs. The Ventura County Jail has three "padded" or "safety cells" which are barren of furnishings on which arrestees can injure themselves. <u>See</u> Sullivan Decl. at 8. Furthermore, the Ventura County jail also has two "detoxification cells" which, like the three safety cells, are situated for ease of access and use. <u>See</u> <u>id.</u> at 8. Furthermore, the Court presumes that the Ventura County jail possesses the full panoply of handcuffs, leg irons, and other alternative restraining devices. Therefore, the Ventura County Jail is not without means to safely restrain arrestees. Additionally, the VCSD owns no more than five Pro-straint chairs, thereby minimizing any hardship an injunction may cause. <u>See</u> Maciel Dep. at 25 ("at least three in the pre-trial facility"); Worthy Decl. at 5 ("four or five"). On the contrary,

- 35 -

1 | hardship to the putative plaintiffs is great.  Unless the
2 | injunction is granted, they will suffer pain and suffering in
3 | violation of their constitutional rights.

4 | ### d.   Public Interest

5 |     Fourteenth Amendment considerations dictate that the public
6 | interest would be best served by granting the injunction.
7 | Furthermore, the safety of the VCSD deputies will not be
8 | compromised by the injunction.  As discussed above, the deputies
9 | have other methods of restraint that they can use for truly
10 | violent arrestees.

11 | ### C.   SCOPE OF PRELIMINARY INJUNCTION

12 |     Having decided that plaintiffs are entitled to a preliminary
13 | injunction, the Court must now decide the scope of such
14 | injunction.  This Court must ensure that "the remedy protects the
15 | plaintiffs' federal constitutional and statutory rights but does
16 | not require more of state officials than is necessary to assure
17 | their compliance with federal law."  Easyriders Freedom, 92 F.3d
18 | at 1496.  This requires the scope of the injunction to be no
19 | broader than necessary to provide complete relief to the named
20 | and putative plaintiffs.  See id.; Meinhold v. United States
21 | Dep't of Defense, 34 F.3d 1469, 1480 (9th Cir. 1994).

22 |     The plaintiffs allege that the chair is being used as a form
23 | of punishment for extended periods of time in violation of
24 | arrestees' constitutional rights.  As such, they seek a full
25 | enjoinment of the use of the chair.  The Court does not believe,
26 | at this stage of the litigation, that the chair itself is an
27 | unconstitutional restraint.  However, the policies associated
28 | with the use of the chair by the VCSD raise serious    .

- 36 -

1  constitutional questions.  Therefore, it is the unlawful
2  practices which must be enjoined.  However, this presents a
3  dilemma.  On one hand, the Court may not issue an injunction
4  which is too broad so as to "overcompensate" plaintiffs, and on
5  the other the Court does not wish to run the everyday operations
6  of the Ventura County Jail.  In light of this dilemma, and in
7  light of the fact that this injunction is temporary, the Court
8  enjoins the VCSD from using the Pro-straint chair in any way
9  until a full trial on the merits.

10     **D.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

11     Defendants claim that they are entitled to summary judgment
12  as to all causes of actions because (1) the Eleventh Amendment
13  bars the suit against the Sheriff and Ventura County, (2) the
14  VCSD is not an entity subject to suit;[7] and (3) that defendants
15  are also entitled to summary judgment as to the Fourth Cause of
16  action because it is based on international treaties which do not
17  provide a proper basis for a private right of action.[8]

18        **1.   STANDARD**

19     Rule 56 of the Federal Rules of Civil Procedure provides
20  that a court shall grant a motion for summary judgment if "the
21  pleadings, depositions, answers to interrogatories, and
22  admissions on file, together with the affidavits, if any, show
23  that there is no genuine issue as to any material fact and that
24  the moving party is entitled to judgment as a matter of law."

25  _____

26     [7]The Consolidated Plaintiffs' First Amended Complaint, which
    did not name the VCSD as a defendant, makes this issue moot.

27
28     [8]The Consolidated Plaintiffs' First Amended Complaint, which
    did not reassert a claim under international law, makes this issue
    moot.  Furthermore, that point is not opposed by plaintiffs.

- 37 -

Fed. R. Civ. P. 56(c).  Material facts are those that may affect
the outcome of the case.  See Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986).  A dispute as to a material fact is
genuine if there is sufficient evidence for a reasonable jury to
return a verdict for the nonmoving party.  See id.

The moving party for summary judgment bears the initial
burden of demonstrating the absence of a genuine issue of
material fact for trial.  See Celotex Corp. v. Catrett, 477 U.S.
317, 323 (1986).  When the moving party has the burden of proof
on an issue at trial, it must affirmatively demonstrate that no
reasonable trier of fact would find other than for the moving
party.  Conversely, on an issue for which the nonmoving party has
the burden of proof at trial, the moving party need only point
out "that there is an absence of evidence to support the
nonmoving party's case."  Id. at 325.

Where the operative facts are substantially undisputed, and
the heart of the controversy is the legal effect of such facts,
such a dispute effectively becomes a question of law that can,
quite properly, be decided on summary judgment.  See Odle v.
Heckler, 707 F.2d 435, 438 (1983).  However, summary judgment
should not be granted where contradictory inferences may be drawn
from undisputed facts. See Braxton-Secret v. A.H. Robins Co., 769
F.2d 528, 531 (1985).  In such a case, the non-moving party must
show that the inferences it suggests are reasonable in light of
the competing inferences.  See Matsushita Elec. Indus. Co. v.
Zenith Radio Co., 475 U.S. 574, 588 (1986).

///

///

- 38 -

1          2.    APPLICATION

2               a.    ELEVENTH AMENDMENT CONSIDERATIONS

3                    i.    Injunctive Relief

4          As a preliminary matter, the Court recognizes that

5     plaintiffs are seeking different remedies: injunctive and

6     monetary.   Defendants' argument that the Sheriff ex officio is

7     immune from suit--although arguable as to the damage claim--must

8     fail as to the injunctive relief sought because such argument is

9     inconsistent with clear precedent from the Supreme Court, which

10    has allowed injunctive relief against even state officials.   See

11    Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 n.3

12    (1989) ("Of course a state official in his or her official

13    capacity, when sued for injunctive relief, would be a person

14    under § 1983 because 'official-capacity actions for prospective

15    relief are not treated as actions against the State.'" (quoting

16    Kentucky v. Graham, 473 U.S. 159, 167 (1985)).   As such, the

17    summary judgment motion, as it relates to the injunctive relief,

18    and as it is based on Eleventh Amendment grounds, is denied.[9]

19                    ii.   Claims for Damages

20         As to the claims for damages, the United States Supreme

21    Court held in Monell v. New York City Dep't of Social Services,

22    436 U.S. 658, 694 (1978) that a local government is liable under

23    section 1983 for its policies that cause constitutional torts.

24    See McMillian v. Monroe County, 520 U.S. 781, 784 (1997). "These

25    policies may be set by the government's lawmakers, 'or by those

26

27

          [9]Needless to say, because former Sheriff Carpenter is no
28    longer the Sheriff ex officio, he is no longer subject to
      injunctive relief.

                              - 39 -

1  Furthermore, California law states that the "board of supervisors

2  shall supervise the official conduct of all county officers."

3  Cal. Gov. Code § 25303.  This supervisory power does not apply,

4  however, when the Sheriff exercises his independent investigative

5  and prosecutorial functions.  See id.  Because the day-to-day

6  operation of the county jail is not part of the Sheriff's

7  investigative or prosecutorial functions, the board of

8  supervisors maintains supervisory authority over the Sheriff's

9  day-to-day operation of the county jail under California law.[12]

10     It is also clear that the state does not actually exercise

11  supervisory authority over the Sheriff's use of the chair.

12  Indeed, Sergeant Maciel testified that the Attorney General did

13

14        [12]Defendants argue that the board of supervisors has no right

15  to control the operations of the jail.  To support their argument,
    defendants cite to Brandt v. Board of Supervisors, 84 Cal. App. 3d

16  598 (1978).  Brandt, however, stands for the proposition that a
    board of supervisors cannot be required to comply with certain

17  sections of the California Administrative Code concerning the
    number and training of correctional officers because it has no duty

18  to hire or train these officers but rather only has the duty to
    appropriate sufficient funds for the cost thereof.  See id. at 600.

19  The court did hold, however, that the sheriff, as a county officer,

20  could be required to do so.  See id.  Having determined that there
    was no such duty on the part of the board of supervisors, the court

21  found that the board of supervisors was not subject to the
    injunction.  Having determined that no duty existed, the court did

22  not need to go any further.  However, in dicta, the court did state
    that the board of supervisors had no direct authority to use its

23  budgetary power to control employment in or operation of the

24  sheriff's office.  See id. at 602.  This is true because the
    authority to hire deputies was vested with the Sheriff himself.

25  See Cal. Gov. Code § 26602.  Nevertheless, such dicta does not
    negate the fact that the board of supervisors has (1) control over

26  how much funding the Sheriff's office receives and (2) supervisory
    authority over the Sheriff when he acts in his official capacity.

27  See Cal. Gov. Code. § 25303 ("Nothing contained [in this section]

28  shall be construed to limit the budgetary authority of the board of
    supervisors over the . . . sheriff.").

- 42 -

1  not provide the VCSD with any policy regarding the use of the
2  chair and that there were no state laws that cover any policies
3  on the use of the chair.  See Maciel Dep. at 79.  Furthermore,
4  "[t]here are no guidelines to remove an inmate from the chair
5  other than relying on [a] supervisor's judgment."  Id. at 46.
6  Additionally, when asked if that "policy that the supervisors are
7  to exercise their discretion to release people placed in the
8  chair . . . was developed by the Ventura County Sheriff's
9  Department," Sergeant Maciel answered "Yes."  Id. at 78.
10  Finally, Sergeant Maciel confirmed that there was "no other
11  agency involved in the development of the policy."  Id. at 36.

12      Having determined the specific activity at issue and that
13  the Sheriff acts as a county policymaker in that respect, the
14  Court now analyzes whether state law provides the sheriff with
15  final policymaking authority over the operation of the county
16  jails, and especially over the use of the Pro-straint chair.  To
17  comport with the rationale expressed in McMillian, and to
18  ultimately come to a conclusion as to whether the Sheriff is a
19  state or county actor when it uses the Pro-straint chair in its
20  operation of the county jails, this Court must analyze the
21  California laws that are analogous to the Alabama state sources
22  examined by the Supreme Court in McMillian and employ the
23  following five factors to determine whether a governmental
24  official or entity is an arm of the state: "(1) whether a money
25  judgment would be satisfied out of state funds; (2) whether the
26  entity performs central governmental functions; (3) whether the
27  entity may sue or be sued in its own name; (4) whether the entity
28  has authority to hold property in its own name; and (5) whether

- 43 -

1  the entity has the corporate status of a state agency."
2  Eaglesmith v. Ward, 73 F.3d 857, 860 (9th Cir. 1996).

3       The Ninth Circuit has stated that the first factor, relating
4  to who is legally obligated to pay the judgment, is the most
5  important factor in the analysis.  See Hyland v. Wonder, 117 F.3d
6  405, 413 (9th Cir. 1997).  Here, there is no evidence which would
7  suggest that any judgment against the county sheriff and
8  personnel in their official capacities would come out of the
9  state coffers.[13]  On the contrary, the evidence on the record
10 shows that the State of California is not a party to this action,
11 that the Sheriff did not cross-claim against the state, and that
12 the state did not intervene to protect its interest.  The Court
13 therefore finds that this factor weighs heavily against a finding
14 that the Sheriff and his personnel are arms of the state for the
15 action complained of here.  As to the second factor, the function
16 of overseeing county jails belongs to the Sheriff, not the state.
17 California statutory law provides that the Sheriff has the
18 "responsibility for operating jails in this state."  See Cal.
19 Pen. Code § 4000.  Furthermore, the law also provides that the
20 "sheriff shall take charge of and be the sole and exclusive
21 authority to keep the county jail and prisoners in it."  Cal.
22 Govt. Code § 26605.  Finally, although the last three factors are
23 the least instructive, the Court notes that at least two out of
24 the three cut against the sheriff's assertion of immunity.  The
25
26
27

---

28      [13]Defense counsel admitted as much in the November 1, 1999
   hearing.

1  VCSD may be able to sue or be sued in its own name,[14] but it
2  cannot hold property, nor does it have a corporate status.

3      In conclusion, an analysis of California law and the
4  admissions of Sergeant Maciel support the conclusion that the
5  Sheriff is the final policymaker as it relates to the use of the
6  Pro-straint chair.  Additionally, the analysis of the five
7  factors set out in McMillian also reveal that the Sheriff is the
8  final policymaker concerning the use of the chair.

9              **b.   THE VENTURA COUNTY SHERIFF'S DEPARTMENT AS AN
                    ENTITY SUBJECT TO SUIT**
10

11     Defendants summarily argue that the inclusion of the VCSD is
12  improper because, under California law, for purposes of a lawsuit
13  for damages, a governmental entity is indivisible.  To support
14  their argument, defendants cite to  Bauer v. County of Ventura,
15  45 Cal. 2d 276, 288 (1955); Sheehan v. Board of Police
16  Commissioners, 188 Cal. 525, 532 (1922); and Talbot v. City of
17  Pasadena, 28 Cal. App. 2d 271, 274 (1938).  The Consolidated
18  Plaintiffs' First Amended Complaint did not name the VCSD as a
19  party to this lawsuit.  As such, this argument is moot.

20              **c.   ALLEGATIONS OF TORTURE UNDER INTERNATIONAL
                    LAW**

21     Plaintiffs' first amended complaint claimed that defendants
22  are liable for violation of the Convention Against Torture and
23  Other Cruel, Inhuman, and Degrading Treatment or Punishment, the
24  International Covenant on Civil and Political Rights, and the
25  customary international law prohibition against such conduct.
26  Defendants moved for summary judgment stating that these alleged
27

28      [14]Defendants had argued that the VCSD could not sue or be sued
    in its own name.

                              - 45 -

1  violations do not give rise to a private cause of action under 42

2  U.S.C. § 1983.  However, plaintiffs did not reassert the

3  aforementioned cause of action in the Consolidated Plaintiffs'

4  First Amended Complaint.  Therefore, this argument is altogether

5  moot.[15]

6      **E.**  **DEFENDANTS' MOTION TO DISMISS NEWLY ADDED DEFENDANTS
        AND TO DISMISS CERTAIN DEFENDANTS IN THE CAPACITIES IN**

7          **WHICH THEY WERE SUED**

8      Defendants argue that the addition of defendants Smith,

9  Johnson, Ilano, and Werre in the Consolidated Plaintiffs' First

10  Amended Complaint violate Rule 4 of the Federal Rules of Civil

11  Procedure.  The motion also argues that former Sheriff Carpenter,

12  current Sheriff Brooks, and Chief of Detention Ken Kipp, as sued

13  in their personal and official capacities, should be dismissed.

14  That last motion is presumably based on Rule 12(b)(6).[16]

15      This motion arises out of the "consolidated Plaintiffs'

16  First Amended Complaint for Damages and Injunctive Relief" filed

17  on September 1, 1999 whereby the four consolidated plaintiffs

18  added defendants Smith, Johnson, Ilano, and Werre.  Defendants

19  stipulated to the filing of that complaint and waived further

20  service.

21  ///

22  ///

23

24  ──────────────

25      [15]Additionally, resolution of defendants' motion for summary

26  judgment in plaintiffs' favor renders plaintiffs' objections to
defendants' evidence and plaintiffs' motion to strike defendants'
motion for summary judgment moot.

27

28      [16]The Court uses "presumably" because the grounds for the
motion were never stated either in the notice of motion nor in the
memorandum of points and authorities.

1      **1.   RULE 4(m)**

2         Rule 4(m) provides that

3         [i]f service of the summons and complaint is not made
          upon a defendant within 120 days after the filing of
4         the complaint, the court, upon motion or on its own
          initiative after notice to the plaintiff, shall dismiss
.5        the action without prejudice as to that defendant or
          direct that service be effected within a specified
6         time.

7
       Fed. R. Civ. P. 4(m).
8
            As part of the aforementioned stipulation, defendants waived
9
       further service of the Consolidated Plaintiffs' First Amended
10
       Complaint.  Nevertheless, defendants now challenge service of the
11
       complaint on the newly added defendants.  By their stipulation,
12
       however, defendants have waived any defect in the service of the
13
       complaint, and as such, may not move under Rule 4.
14
            Defendants did reserve the right to question the propriety
15
       of any newly added defendants.  However, Rule 4 is not the proper
16
       vehicle to do so at this stage of the litigation.  As such,
17
       defendants' motion to dismiss the newly added defendant based on
18
       Rule 4 is denied.
19
                **2.   DISMISSAL OF DEFENDANTS CARPENTER, BROOKS, AND**
20                      **KIPP IN THEIR PERSONAL CAPACITIES**

21          Defendants also move to dismiss defendants Carpenter,

22     Brooks, and Kipp in their personal capacities claiming that the

23     complaint does not allege that they directly participated in the

24     alleged violations of plaintiffs' constitutional rights.  This

25     motion is, in essence, a Rule 12(b)(6) motion.

26                      **a.   STANDARD**

27          Rule 12(b)(6) provides for dismissal when a complaint fails

28     to state a claim upon which relief may be granted.  See Fed. R.

1   Civ. P. 12(b)(6).  A complaint fails to state a cause of action

2   if it does not allege facts necessary to support a cognizable

3   legal claim.  See Balistreri v. Pacifica Police Dept., 901 F.2d

4   696, 699 (9th Cir. 1990); Robertson v. Dean Witter Reynolds,

5   Inc., 749 F.2d 530, 533-34 (9th Cir. 1984).

6       In reviewing a Rule 12(b)(6) motion, a court must presume

7   the truth of factual allegations in the complaint and draw all

8   reasonable inferences in favor of the non-moving party.  See

9   Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th

10  Cir. 1995); Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th

11  Cir. 1987).  Dismissal under Rule 12(b)(6) is appropriate "only

12  if it is clear that no relief could be granted under any set of

13  facts that could be proved consistent with the allegations."

14  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) (citing Conley

15  v. Gibson, 355 U.S. 41, 45-46 (1957) (dismissal appropriate only

16  where "plaintiff can prove no set of facts in support of his

17  claim which would entitle him to relief")); Ascon Properties,

18  Inc. v. Mobil Oil Co., 866 F.2d 1149, 1152 (9th Cir. 1989).  The

19  issue is not whether the plaintiff will ultimately prevail but

20  whether the plaintiff is entitled to offer evidence to support

21  the plaintiff's claim.  See Usher, 828 F.2d at 561.

22              b.   APPLICATION

23       It is clear that prison officials can be liable in their

24  personal capacities under Section 1983 if their conduct causes

25  the violation.  See McRonie v. Shimoda, 795 F.2d 780, 783-84 (9th

26  Cir. 1986).  As such, prisoners can state a claim against prison

27  personnel under section 1983 "by establishing that prison

28  personnel acted with 'deliberate indifference' in creating the

- 48 -

1   condition that violates the Eighth Amendment." <u>Leer v. Murphy</u>,

2   844 F.2d 628, 633 (9th Cir. 1988) (quoting <u>Johnson v. Duffy</u>, 588

3   F.2d 740, 743 (9th Cir. 1978)).

4       The complaint alleges that defendants Carpenter, Brooks, and

5   Kipp disregarded the unconstitutional conduct of the deputies and

6   failed to adequately investigate and discover and correct such

7   unconstitutional conduct, which "caused the violation of the

8   plaintiffs' constitutional rights." <u>See</u> Consolidated Plaintiffs'

9   First Amended Complaint at 12.  Additionally, plaintiffs allege

10  that the instant defendants knew about this pattern of

11  unconstitutional violations but failed to take steps to train,

12  supervise, investigate, or instruct deputies and jailers, and as

13  a result, plaintiffs were harmed. <u>See id.</u>  Furthermore,

14  plaintiffs allege that "the conduct alleged by the plaintiffs has

15  been authorized and ratified by these defendants in their

16  individual and official capacity." <u>Id.</u> at 13.  These allegations

17  support a claim that the prison personnel "acted with 'deliberate

18  indifference' in creating the condition that violates the

19  Fourteenth Amendment." <u>Leer v. Murphy</u>, 844 F.2d 628, 633 (9th

20  Cir. 1988) (quoting <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir.

21  1978)).  Therefore, defendants' motion to dismiss is denied.

22      Additionally, defendants seem to argue that because the

23  County of Ventura has been named as a defendant, the inclusion of

24  Carpenter, Brooks, and Kipp in their official capacities is

25  duplicative and unnecessary.  However, these defendants are

26  properly named defendants, at least as it relates to their

27  personal capacity, and the Court therefore need not address this

28  issue at this stage.

V.    CONCLUSION

       For the foregoing reasons, the Court orders that (1)
plaintiffs' motion to certify the class is GRANTED as to the
class defined in this opinion; (2) plaintiffs' motion for a
preliminary injunction is GRANTED thereby prohibiting the Ventura
County Jail from using the Pro-straint chair in any way; (3)
defendants' motion for summary judgment is DENIED; (4)
plaintiff's motion to strike defendants' motion for summary
judgment is MOOT; and (5) defendants' motion to dismiss newly
added defendants and capacities is DENIED.

IT IS SO ORDERED.

DATED: _November 10, 1999_            _Lourdes G. Baird_
                                      LOURDES G. BAIRD
                                      United States District Judge

                                - 50 -